UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Fort Lauderdale Division

Case Number:

KEISHA HALL,

     Plaintiff,

vs.

TEVA PHARMACEUTICAL
USA, INC.,

     Defendant.

_____/

## <u>Complaint – Jury Trial Demanded</u>

Plaintiff, Keisha Hall, sues defendant Teva Pharmaceutical USA, INC., and alleges:

### Introduction

1.    This is an action by Keisha Hall, a certified public accountant, certified fraud examiner and former director of finance for the Latin America region Teva Pharmaceutical USA, INC.'s ("Teva"), whom Teva fired shortly after she began cooperating in a Securities and Exchange Commission/Department of Justice investigation into potential violations of the Foreign Corrupt Practices Act ("FCPA") and the Sarbanes-Oxley Act ("SOX"), stemming from, among other things, allegations of bribery of

government officials within the region.  Hall's termination, additionally, came within days of her return from leave protected under the Family and Medical Leave Act.  Hall seeks all legal and equitable relief available under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §§ 78u-6 ("Dodd-Frank Act"); the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"), and; Florida's private-sector whistle-blower's act, § 448.101, et seq., FLA. STAT. (2015), as well as her costs, including reasonable attorney's fees and litigation expenses.

## Jurisdiction and Venue

2.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Hall's claims arise under 15 U.S.C. § 78u-6 and 29 U.S.C. § 2615.  The court has supplemental jurisdiction to determine the state claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in the Fort Lauderdale division of this Court because Hall resides in Broward County and because at all times material she worked out of Teva's offices in Weston, Florida.

## Parties

4.     Keisha Hall, former associate director of finance for Teva's Latin America region, was at all times material:

   a.     a "whistleblower" as defined by the Dodd-Frank Act;

   b.     an "employee" as envisioned by § 448.101(3) FLA. STAT. (2013), and;

c.    an "eligible employee" as envisioned by 29 U.S.C. § 2611 (2).

5.    Teva is a publicly traded company with reporting obligations under the Securities Exchange Act of 1934 and at all times material was an "employer" as envisioned by 15 U.S.C. § 78u-6, 29 U.S.C. § 2611 (4), and § 448.101(3) FLA. STAT. (2013).

**General Allegations**

6.    Keisha Hall ("Hall"), a masters-level certified public accountant — who also holds certifications as a fraud examiner and in financial forensics — began working for Teva in 2008 as internal control manager for Teva's Latin America region, reporting to Salvador Torralbas ("Torralbas"), who served as both chief financial officer and chief compliance officer for the region.

7.    Shortly after Hall began working she became aware that the Latin America region had a history of events related to corruption.  Hall was apprised of investigations conducted by outside counsel earlier in the year that identified numerous FCPA violations, low inventory controls in Mexico and unauthorized payments to doctors in Chile.  Hall also became aware of a number of other compliance issues in the region, including bribery of government officials, which in many regional countries included doctors working for government hospitals.  Between 2007 and 2010 various FCPA-

related investigations were conducted by third parties, each of which resulted in findings and remediation recommendations.

8.     Hall was tasked in 2009 with developing FCPA forms which could be used to track payment approval for a number of high-risk activities, including meals, conferences, gifts, and charitable contributions. The forms were to supplement the region's FCPA policy, which had not been finalized. In June 2010, a global FCPA anti-corruption policy and implementation plan, which Hall helped draft, became effective for all Teva entities.

9.     Hall began in 2010 working on sales and marketing guidelines to help cover any gaps in Teva's global FCPA anti-corruption policy and shortly thereafter began developing a portal that would automate the FCPA forms and document all activities implicated by the FCPA and supporting information related to those activities.

10.     Hall began reporting to Diana Borges ("Borges"), the new regional compliance officer for the Latin America region in or around January 2011.  Borges immediately began implementing a "new approach" to compliance, as she stated that previous compliance efforts had been too restrictive.  Borges advised that the role of compliance was not to interfere with the business-related needs of the company.  Borges conveyed to Hall that she was "not too concerned with the FCPA" because such violations would "only result in fines," and immediately began dismantling many of

the monitoring controls and compliance mechanisms previously put in place by Hall and Torralbas. Borges ordered Hall to retract the approved sales-and-marketing guidelines and later advised local managers that the automated portal was not to be used unless she reviewed the activity outside of the system first.  Borges also openly criticized the global FCPA policy as being too restrictive.

11.    In May 2011 Hall met with Borges's supervisor, Teva's Global Compliance Officer Michael Dearborn ("Dearborn").  During the meeting Hall spoke out about Borges's new approach to compliance and her *laissez-faire* attitude towards internal controls and monitoring.

12.    Shortly after this meeting, Borges, using the Human Resources function, pushed Hall out of her role in compliance; Hall assumed a position under her former supervisor, Torralbas.

13.    Hall met in September 2011 with Teva's external auditors and explained that the level of monitoring in the region had changed as Borges had dismantled a number of internal controls.  Hall also noted that previous major audit findings in Argentina regarding a lack of adequate monitoring and formal processes, had never been properly addressed by Borges.

14.    Torralbas, with the assistance of Hall and Mario Rodriguez, former director of Teva's Shared Service Center, drafted and sent to Dearborn in November 2011 a SOX-deficiency memo that outlined Borges's risky approach to compliance and her elimination of compliance-related

resources in the region.  It also documented the continued lack of monitoring and remediation efforts in Argentina.  Dearborn and Borges each responded separately to the memo.

15.    Hall in January 2012 sent the SOX memo to Osnat Ram-Shalom ("Ram-Shalom"), who as Teva's Israel-based global SOX leader, forwarded it to the audit committee.

16.    Torralbas told Hall in February 2012 that Teva was trying to terminate him because of the 2011 SOX memo.  Torralbas retained counsel.

17.    Lisa Devitis ("Devitis"), senior manager, finance, was named in March 2012 as Teva's new leader for all SOX-compliance issues in the Americas, which included the Latin America region.  Devitis reported to Debbie Griffin ("Griffin"), Teva's chief financial officer for the Americas.

18.    Hall and Torralbas wrote a second SOX-deficiency memo in or about September 2012, stating that Borges had failed to undertake remediation efforts proposed in her response to the 2011 SOX memo, and finding a continued lack of remediation in Argentina. Hall submitted the deficiency memo to Ram-Shalom and also to external auditors.

19.    Hall learned in February 2013  that Torralbas had not received a SOX certification to sign for the year 2012.  Hall contacted Ram-Shalom, who advised Hall that the SOX deficiency that was reported the year before — which had not been remediated — was not going to be included in the

Corporate Finding report that would be shared with the external auditors or audit committee.  Ram-Shalom explained that she was satisfied with the explanation provided by Dearborn and Judith Vardi, previous vice president of the Latin America region.  Ram-Shalom advised Hall that she was tired of hearing about Torralbas's compliance concerns, which she likened to "beating a dead horse," and stated she would close the finding.  Hall reported this to Torralbas and then Vice President of Latin America, Roberto Prego-Pineada.

20.    Torralbas was made Teva's head of financial operations for the Americas in August 2013.  He promoted Hall to associate director of finance in November 2013 .

21.    Hall was advised by Teva around the same time that the SEC and DOJ requested her participation as a witness in an investigation related to compliance matters in the Latin America region.

22.    Hall met December 4, 2013 with attorneys from the DOJ and SEC, as well as with an FBI special agent, and discussed the following compliance issues:

      a.    the high number of "consultant" contracts between Teva and physicians in Argentina, as well as the large number of Teva-sponsored conferences within the country;

      b.    possible bribery of government officials in Venezuela and transfers of money out of that country;

      c.    use of Teva expense reports to facilitate fraudulent payments to the Mexican government, and additional fraud-related concerns regarding Teva's relationship with a local Mexican distributor, Nadro;

      d.    Borges's tenure as compliance officer for the Latin America region, during which Borges had systematically upended many of the compliance initiatives put in place by Hall and Torralbas, exhibited a dismissive attitude towards the FCPA, sought to supplant transparency and record-keeping through oral communications, ignored reports of the fraudulent payments to the Mexican government and directed the local compliance manager in Mexico, Lazaro Muñiz ("Muñiz"), to ignore compliance-related instructions from Hall and Torralbas;

      e.    a 2011 meeting with Dearborn, during which Hall spoke critically about Borges's *laissez-faire* approach to compliance, internal controls and monitoring, and

      f.    the 2011 and 2012 SOX memos and a late 2012 meeting with external auditors in Israel regarding SOX-related issues, which both Torralbas and Griffin attended.

23.    Hall again met with the DOJ, SEC and FBI January 23, 2014. Hall testified during this meeting about, among other things, inaccuracies in Dearborn's response to the 2011 SOX memo:

      a.    Hall contradicted Dearborn's assertion that in 2011 "there were no fundamental changes from prior monitoring efforts," advising that

Borges had indeed made fundamental changes to the monitoring efforts in the region by dismantling the controls put in place by Hall and Torralbas;

b.     Hall challenged Dearborn's contention that a record of local payment requests was kept manually and through use of the portal, advising that Borges refused to use the portal *specifically because* the portal kept a record of approved transactions and incorporated auto-reporting.

c.     Hall questioned Dearborn's assertion that Borges had proactively assessed any activities within the region that were not addressed within Teva's anti-corruption policy in effort to develop future controls in those areas, stating that no such assessments had been circulated within the compliance department.

d.     Hall challenged Dearborn's contention that commercial employees had shouldered additional compliance-related responsibilities, advising that commercial employees never received formal training regarding compliance matters and adding that Borges had actually given employees specific instructions to ignore any compliance-related direction that came from Hall or Torralbas.

e.     When questioned about Dearborn's plan to establish a formal compliance program that would include controls regarding promotional activities, and his plan to conduct site visits within the region to introduce and monitor the plan, Hall advised that not only had these site

visits never taken place, but that no such program had ever been established.

24.     Additionally, during the January 23, 2014 meeting:

a.     Hall provided additional information about the excessive number of consultant contracts in Argentina, including a meeting that took place in Miami regarding the contracts and a presentation that was given. Counsel for the SEC, Jenny Trotman, asked Hall to provide a copy of the presentation and other documents and correspondence kept by Hall regarding the consultant contracts.

b.     Hall also provided additional information regarding the increase in Teva-sponsored conferences in Argentina, and her refusal to continue approving payment for the conferences around September 2010. Trotman asked Hall to search for correspondence relating to the conferences.

c.     Hall provided information about the sales-and-marketing guidelines she had developed in 2010 to cover gaps in in Teva's global FCPA anti-corruption policy and advised that, after she had circulated the guidelines to local management, Borges had ordered Hall to retract the guidelines because Borges contended they were in draft form.  Trotman asked Hall for a copy of the guidelines and related correspondence.

d.     Hall testified about the development of the portal, which was designed to automate the FCPA forms and to create an electronic record

of approved transactions for each Teva subsidiary.  Hall explained that the portal could have been in use as early as March 2011, but its implementation was delayed by Borges until October 2011.  Hall also discussed her efforts to pre-populate the FCPA forms with certain information related to health care professionals, and Borges's opposition to those efforts because Borges believed the forms kept a record of too much information.

e.      Hall testified about her attempts to hire companies to perform due diligence concerning consultants and representatives, and Borges's opposition to those efforts.  Hall was asked, but could not confirm, whether any due diligence had been done on Nadro, the Mexican distributor discussed during Hall's prior testimony.  Trotman asked Hall for copies of correspondence from Borges relating to the due diligence procedures.

f.      Hall expanded on her earlier testimony regarding Borges's having ignored the fraudulent payments to the Mexican government and Borges's directing Muñiz, the former internal control manager for Mexico, not to contact Hall.  Trotman asked Hall to provide supporting correspondence.

g.      Hall provided additional testimony about the issues outlined in the 2011 SOX memo. Trotman asked Hall to search for Borges's response to the 2011 SOX memo, and also to search for correspondence

related to the late 2012 meeting with external auditors in Israel regarding SOX-related issues.

25.    David Esseks, Esq., a New York City securities lawyer whom Teva had retained to represent Hall during the investigation suggested to Hall that she let him share with Teva's counsel the content of Hall's January testimony; Hall complied in or about March 2014.

26.    Hall continued in March and April 2014  to assist with the SEC/DOJ inquiry, searching for and finding much of the documentation and correspondence requested by the SEC at the January meeting.  On April 15, 2014 Hall, through Esseks, provided the documents requested by the SEC to counsel for Teva.

27.    Teva held a meeting around the same time for all department heads for the Latin America region.  Hall conducted a presentation during that meeting regarding the SOX compliance process and past issues in the region.  Hall discussed the fact that Devitis was not utilizing the internal control resources that were put in place.  Hall advised that the current SOX process badly needed improvement.  Griffin exhibited visible signs of upset during Hall's remarks.

28.    Hall shortly afterwards notified Teva of her pregnancy and went out on FMLA leave beginning July 2014.

29.    Torralbas called Hall in August 2014 and again advised that Teva was trying to terminate him.

30.     Torralbas retired from Teva the following month.

31.     Hall learned immediately after Torralbas's September 2014 retirement that Devitis had made statements at a September meeting in Philadelphia of the Internal Control Department regarding a plan to get rid of not only Hall, but her entire department.

32.     Prior to going out on FMLA leave, Hall had been responsible for monthly reconciliation of compliance activities, which included monthly reports to Dearborn and regional and senior management.  Hall was reporting compliance issues on a monthly basis and advising whether investigations into any compliance issues might be necessary.  As part of this process Hall instructed Teva's accounts payable department to stop payment on various vendors and physicians in Venezuela and Chile.

33.     Hall applied in October 2014 for a promotion to an open position as financial compliance director, reporting to Debbie Griffin.  Throughout Hall's employment with Teva, she had received excellent performance reviews and had earned her promotion just one year prior to associate director of finance for the Latin America region.  Given Hall's credentials and experience, she was well-qualified for the position.  Griffin refused to even interview Hall for the position.

34.     Hall returned from leave on November 4, 2014.  Two days later she received an email from Teva's Human Resources Director, Pamela Daknis ("Daknis"), requesting a meeting.  During the meeting Michael Rahill

("Rahill") from Teva's global compliance department. advised that an anonymous whistleblower had alleged that Hall had used Teva assets and personnel to conduct personal business.  Hall unequivocally denied the allegations.

35.    Rahill and Daknis placed Hall on administrative leave, effective immediately, and seized Hall's laptop.  Hall suggested that Rahill have Teva's IT department make a copy of her laptop hard drive so she could maintain possession of it, as she was scheduled to meet with external auditors during the week of November 11, 2014.  Rahill called his supervisor to ask whether this was permissible, but when Rahill walked back into the room, he stated that "we can't leave [you] with anything."

36.    On November 25, 2014 Hall met with Rahill and Thelma Powell ("Powell"), a local human resources representative.  Hall requested permission to have a witness present at the meeting, but her request was denied.  During the meeting Hall answered questions from Rahill about Hall's involvement in certain non-profit entities and her participation in several networking parties and events.  Hall explained that she was actively involved in the community and served on the boards of several foundations. Hall confirmed that while she may have sent personal emails from her work account from time to time, her supervisor was always aware of her activities and this had never been an issue throughout her entire employment with Teva.  Hall advised that the activities were limited and did not constitute

businesses as she had no customers, employees, invoices or profit, and the activities never interfered with her work for Teva.

37.     Rahill switched focus from the unfounded concerns about Hall's conducting personal business using Teva's assets to alleged concerns about the volume of personal content on Hall's laptop, such as videos and pictures of family, which Rahill contended violated Teva's electronic communications policy.  Hall was unaware of any such policy, but was aware that many other employees maintained personal data on their laptops and also sent personal emails from their work accounts, including Norman Henriquez, former finance director for Teva's Shared Service Center, whom Hall had investigated the year prior for an unrelated issue.  Hall reiterated that this had never been an issue in the past and added that, throughout her employment with Teva, she had worked extensive hours and traveled regularly on the company's behalf, making it impractical to carry two laptops.

38.     After Rahill finished questioning Hall, Powell read a prepared letter from Teva's HR department stating that Hall's employment was being terminated for having violated Teva's electronic communications policy by using her laptop for personal e-mails and the storage of personal videos.

39.     Teva subsequently provided a third reason for Hall's termination: it claimed to the Department of Unemployment Compensation

that Hall was terminated for instigating conflict, but alleged no misconduct associated with work.

### Count I:  Dodd-Frank Whistleblower Protection

40.    Plaintiff, Keisha Hall, Hall realleges and adopts, as if fully set forth in Count I, the allegations of ¶¶ 1-39.

41.    Hall engaged in protected activity pursuant to 15 U.S.C. 78u-6(h)(1)(A)), as more particularly alleged in ¶¶ 18, 19, 22-27 and 32, i.e., she made protected disclosures and provided testimony and information to the SEC and assisted the SEC with its investigation, regarding what she reasonably believed to be possible securities law violations that had occurred, were ongoing or were about to occur, and were subject to the jurisdiction of the SEC.

42.    Teva, in its failure to promote Hall to its open financial compliance director position in October 2014, a position for which she was qualified, and in terminating Hall's employment in November 2014, retaliated and discriminated against Hall because of her protected activity.

43.    Hall was treated differently from other director-level employees given the abrupt manner in which she was placed on administrative leave and the alleged concerns about personal data on her laptop.  The pretextual nature of Teva's purported reasons for failing to promote Hall, and then for terminating her, is evidenced by:

a.    DeVitis's September 2014 announcement of a plan to get rid of Hall;

b.    Teva's long-time prior awareness, through Hall's supervisors, of her personal use of her Teva laptop;

c.    Teva's inconsistent application of its own policy concerning computer usage;

d.    the falsity of Teva's accusation that Hall had improperly used Teva resources for personal gain;

e.    Teva's shifting explanations for its actions, as more particularly alleged in ¶¶ 34-39.

44.    As a direct, natural and proximate result of Teva's wrongful actions, Hall has suffered damages, including but not limited to lost wages, litigation costs and attorneys' fees.

45.    Pursuant to 15 U.S.C. 78u-6(h )(1)(c ), Hall's relief "shall" include the following:

a.    Reinstatement with the same seniority status that she would have had, but for Teva's discrimination;

b.    Two times the amount of back pay otherwise owed to her, with interest; and

c.    Compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.

WHEREFORE, Plaintiff, Keisha Hall, prays that this Court will grant judgment for her, and against Defendant, Teva Pharmaceuticals:

*One*, reinstating Hall with the same seniority status that she would have had, but for Teva's discrimination;

*Two*, awarding Hall two times the amount of back pay otherwise owed to her, with interest;

*Three*, awarding Hall compensation for litigation costs, including expert witness fees and reasonable attorneys' fees, and

*Four*, granting such other and further relief as is just.

## Count II: Retaliation in Violation of the Family Medical Leave Act

46.    Plaintiff, Keisha Hall, realleges and adopts, as if fully set forth in Count II, the allegations of ¶¶ 1-3, 4(c), 5, 28 and 33-39.

47.    Hall engaged in protected activity by taking leave under the FMLA, as more particularly alleged in ¶¶ 28 and 34.

48.    Teva, in failing to promote Hall to its open financial compliance director position in October 2014 and in terminating Hall's employment in November 2014 — just days after Hall returned from leave — discriminated against Hall because she took protected leave under the FMLA, in violation of 29 U.S.C. § 2615.

49.    As a direct, natural, and proximate result of Teva's wrongful actions, Hall has suffered damages, included but not limited to lost wages.

50.   Hall additionally is suffering irreparable harm by being deprived of her federal statutory right against retaliation because she engaged in activity protected by the FMLA, for which there is no adequate remedy at law.

51.   Hall is entitled to recover her reasonable attorney's fees and litigation expenses pursuant to 29 U.S.C. § 2617.

WHEREFORE, Plaintiff, Keisha Hall, prays that this Court will grant judgment for her, and against Defendant, Teva Pharmaceuticals:

***One***, determining and declaring that Teva's failure to promote Hall and Teva's termination of Hall violated her rights under the FMLA;

***Two***, enjoining Teva, both preliminarily and permanently, from discriminating against Hall because she engaged in activity protected under the FMLA, and affirmatively to make her whole by restoring her to the position of financial compliance director, with all seniority and benefits, or, if that is not effective as a make-whole remedy, awarding her front pay;

***Three***, granting judgment against Teva for damages, including lost wages/back pay, payment for lost benefits, liquidated damages, prejudgment interest, attorney's fees and litigation expenses, and,

***Four***, granting such other and further relief as is just.

### Count III: Violation of Florida Whistle-blower's Act

52.   Plaintiff, Keisha Hall, realleges and adopts, as if fully set forth in Count III, the allegations of ¶¶ 1-39.

53.     Hall engaged in protected activity pursuant to § 448.102, FLA. STAT. (2013), as more particularly alleged in ¶¶ 11, 13-15, 18, 19, 22-27 and 32.

54.     Teva's passing over of Hall for a promotion and Teva's termination of her employment each constituted a "retaliatory personnel action," as envisioned by § 448.101(5), FLA. STAT. (2013), i.e., an "adverse employment action taken by an employer against an employee in the terms and conditions of employment."

55.     As a direct, natural, proximate and foreseeable result of Teva's retaliatory personnel actions, Hall has suffered past and future monetary loss, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

56.     Hall is entitled, pursuant to § 448.103(2), FLA. STAT. (2015), to:

   a.     an injunction restraining continued violation of this the Florida Whistle-blower's Act;

   b.     instatement to the job of Financial Compliance Director, reinstatement to her former position, or, if that is not practicable, an award of front pay;

   c.     reinstatement of full fringe benefits and seniority rights;

   d.     compensation for lost wages, benefits, and other remuneration; and

   e.     any other compensatory damages allowable at law.

57.     Plaintiff is entitled, pursuant to to § 448.104, FLA. STAT. (2015), to recover her reasonable attorney's fees, expenses and court costs.

WHEREFORE, Plaintiff, Keisha Hall, prays that this Court will grant judgment for her, and against Defendant, Teva Pharmaceuticals:

**One**, granting her an injunction restraining continued violation of the Act;

**Two**, reinstating Hall to the same position held before the retaliatory personnel action, or to an equivalent position;

**Three**, reinstating her full fringe benefits and seniority rights;

**Four**, compensation Hall for lost wages, benefits, and other remuneration;

**Five**, awarding any other compensatory damages allowable at law, and

**Six**, granting such other and further relief as is just.

### Demand for Jury Trial

Plaintiff, Keisha Hall, demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No. 470228
WRAmlong@TheAmlongFirm.com
RYAN BRENTON
Florida Bar No. 107675
RBrenton@TheAmlongFirm.com

AMLONG & AMLONG, P.A.

500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
(954) 462-1983

***Attorneys for the plaintiff,
Keisha Hall***