UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-61536-BLOOM/Valle

KEISHA HALL,

      Plaintiff,

v.

TEVA PHARMACEUTICAL USA, INC.,

      Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Teva Pharmaceutical USA, Inc.'s ("Defendant" of "Teva") Motion for Summary Judgment, ECF No. [66], seeking summary judgment in its favor on each of Plaintiff Keisha Hall's ("Plaintiff") claims. *See* Compl., ECF No. [1]. The Court has carefully reviewed the Motion, all supporting and opposing submissions, the record in this case, and applicable law. For the reasons set forth below, the Motion is granted.

## I. BACKGROUND

Plaintiff filed this action on July 28, 2015, alleging violations of the Dodd-Frank Street Reform and Consumer Protection Act, 15 U.S.C. §§ 78u-6 ("Dodd-Frank Act") (Count I), the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA") (Count II), and Florida's private-sector whistle-blower's act, Fla. Stat. § 448.101 *et seq.* ("FWA") (Count III). Plaintiff was employed by Defendant, a leading manufacturer of generic medicines worldwide, from August 2008 to November 25, 2014. Defendant's Statement of Undisputed Material Facts, ECF No. [67] ("Def. SOF") ¶ 1-2. Defendant initially hired Plaintiff as Manager of Internal Controls supporting its Latin America business region. *Id.* ¶ 8. For most of the time she was in that role,

Plaintiff reported to the Chief Financial Officer for Latin America, Salvador Torralbas. *Id.* ¶ 9. Plaintiff and Mr. Torralbas had a "very good" relationship, and he confided in Plaintiff when Mr. Torralbas thought his job was in jeopardy following his employer's investigation prompted by several complaints against him. *Id.*; Torralbas Dep., ECF No. [68-6] at 12, 15-16; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ECF No. [73] ("Pl. SOF") ¶ 77. Mr. Torralbas is also the individual whom Plaintiff alleges she assisted in reporting certain concerns to Teva Management. Def. SOF ¶ 9 (citing Compl. ¶¶ 14, 18). Mr. Torralbas ultimately took an early retirement in September 2014, but continued as a Teva employee through December 2014. Although the ultimate decision to leave was his, Mr. Torralbas testified that he believed he was forced out. Pl. SOF 79; Torralbas Dep., ECF No. [74-5] at 42.

From January 2011 to May 2011, Plaintiff reported to Diana Borges, the new Regional Compliance Officer for Latin America. *Id.* ¶ 10; Pl. SOF ¶ 61. According to Plaintiff, in May 2011 she complained to Ms. Borges' boss, Global Compliance Officer Michael Dearborn, that the Latin America region lacked monitoring because of changes implemented by Ms. Borges. Plaintiff also states that she reported these concerns to Mr. Torralbas and Teva's external auditors. Pl. SOF ¶¶ 61-62. Plaintiff and Ms. Borges were apparently "oil and water" and, according to Plaintiff, following Plaintiff's complaints, Ms. Borges tried to fire Plaintiff. Mr. Torralbas, however, created a position for Plaintiff with financial compliance and internal control responsibilities in the Shared Service Center ("SSC"). *Id.* ¶ 63; Def. SOF ¶10 ("Plaintiff did not like working for Ms. Borges, so, in May 2011, Mr. Torralbas offered Plaintiff the opportunity to transfer back to a position under him in Teva's Finance Shared Services Center . . . ."). Plaintiff's duties starting in May 2011 included developing "SOX test plans" and executing SOX compliance activities, supporting investigations, especially those related to fraud or FCPA

allegations, assisting management with the implementation of internal audit recommendations, and monitoring documentation of payments to vendors. *Id.* ¶ 12. Part of Plaintiff's role was to "highlight the deficiencies that [she] saw or the things that were happening in the compliance area." *Id.* (quoting Pl. Dep., ECF No. [68-1] at 298). In November 2013, Plaintiff was promoted to Associate Director, Finance for the Latin America Region, and received a corresponding pay increase. *Id.* ¶ 13. Plaintiff took FMLA leave in 2010 without incident when she had her first child. Plaintiff again took FMLA leave when her second child was born in July 2014. *Id.* ¶ 14.

On June 30, 2014, Teva's Office of Business Integrity ("OBI") hotline, through which Teva employees may report misconduct anonymously, received an anonymous complaint alleging that "Keisha Hall has been running her own event planning business out of the Teva offices by using company resources to accomplish her personal objectives." *Id.* ¶ 17; Pl. SOF ¶ 17 ("Not disputed."). The complaint alleged that Plaintiff had used Teva's resources, including its email system and printers to accomplish tasks related to her personal outside business, and that she had used other Teva employees to help with these tasks. Def. SOF ¶ 18; Pl. SOF ¶ 18 ("Not disputed."). Plaintiff suspects that the complaint, though made anonymously, was made by an employee who worked directly under Plaintiff because she was angry that Plaintiff did not promote her and asked her to work late. Def. SOF ¶ 19; Pl. SOF ¶ 19 ("Not disputed.").

OBI Investigator Michael Rahill conducted an investigation of the hotline complaint, which showed the following:

- Plaintiff owned/or was an agent of at least two outside businesses, Vale Vibe and Jewel Miami, LLC ("Jewel Miami") in the event-planning field. Plaintiff was also involved in several non-Teva-related activities about which she communicated using her Teva email

account, including a clothing company and a community organization called the Miami Women's Club.

- Plaintiff sent or received hundreds of emails during certain months from her Teva email account related to her personal businesses, including Jewel Miami.

- At least one of Jewel Miami's vendors sent Plaintiff a contract to her Teva email account that listed Teva as a party to the contract. Plaintiff agrees that communicating with the vendor from her Teva email confused the vendor and caused the vendor to think Teva would be a party to the contract. A separate Jewel Miami vendor sent Plaintiff an invoice to her Teva email account that listed Teva as a party to be billed through Plaintiff.

- Plaintiff used Teva's printers, scanners, and computer processing capabilities for her outside activities, and used Teva employees to assist with tasks such as making labels and printing color copies of large spreadsheets.

- Plaintiff admits she sent confidential Teva documents to her mother.

Def. SOF ¶ 20; Pl. SOF ¶ 20 ("Not disputed."). At the same time Plaintiff was running Jewel Miami, she was telling Teva management that her SSC group was short-staffed and needed additional employees. Def. SOF ¶ 25; Pl. SOF ¶ 25 ("Not disputed."). Mr. Torralbas was not aware of her outside business activities during her employment. Def. SOF ¶ 26; Pl. SOF ¶ 26 ("Not disputed.").

Defendant waited until after Plaintiff had returned from maternity leave in November 2014 to interview her about the OBI investigation. Def. SOF ¶ 27. On November 26, 2014, Mr. Rahill and Human Resources Director, Pamela Daknis, interviewed Plaintiff. Def SOF ¶ 28. They also informed Plaintiff that they would need to take her laptop for the investigation and that she would be placed on administrative paid leave. *Id.* ¶ 29. Mr. Rahill found a large amount of

4

personal data on Plaintiff's laptop, including invoices, contracts, and notes related to Jewel Miami and Vale Vibe. *Id.* ¶ 30. Ultimately, Jennifer Flaisher, VP of Human Resources recommended termination because Plaintiff's conduct violated the  Electronic Communications Policy ("ECP"). Deborah Griffin, Teva's Chief Accounting Officer, adopted and approved the recommendation. *Id.* ¶ 31. Ms. Flaisher testified that she met or spoke with Michael Dearborn, Ms. Daknis, Mr. Rahill, and his boss, Katherine Veit, who runs the OBI hotline, as well as with certain individuals from the legal department, including Thomas McDonough and John Pease. Flaisher Dep., ECF No. [74-1] at 39-41. Ms. Flaisher further stated that she "made the recommendation with input from [Ms. Veit] and [Mr. Dearborn], of course, and [Mr. McDonald]." *Id.* at 44.

On October 20, 2014, while still out on maternity leave, Plaintiff applied for a newly created position, Financial Compliance Director, prompting Ms. Griffin to state in an email to Ms. Flaisher "OMG," short for "Oh, my God." Pl. SOF ¶ 85; Ex. 22, ECF No. [74-22]; Griffin Dep., ECF No. [74-2] at 53 ("A. Not my finest professional moment, but I knew it would be complicated to have an employee apply for a position when they're under investigation. And this one, it was even further complicated, the fact that she was out on maternity leave."). At that time, Ms. Griffin was aware of the OBI investigation, but it had not yet been completed. Ms. Griffin, in connection with Ms. Flaisher, decided not to interview Plaintiff until the conclusion of the investigation, and decided to cancel Plaintiff's candidacy for the position once the investigation was substantially complete. Def. SOF ¶ 35.

Plaintiff alleges that she participated in several activities protected under the Dodd-Frank Act and the FWA while employed at Teva. In November 2011, Mr. Torralbas drafted a memorandum (the "2011 SOX Memo") to Mr. Dearborn, Teva's Chief Compliance Officer,

about recommendations to improve Latin American internal controls. Plaintiff and another SSC employee, Mario Rodriguez, assisted in drafting the Memo, although neither of their names appear on it. *Id.* ¶ 37; Pl. SOF ¶¶ 37, 64. Mr. Torralbas testified that he received criticism from Mr. Dearborn and Diana Borges, Mr. Dearborn's direct report, regarding the Memo. Def. SOF ¶ 39 (citing Torralbas Dep., ECF No. [68-6] at 7). Hall also alleges that in 2012, she and Mr. Torralbas wrote a second SOX deficiency memorandum (the "2012 SOX Memo"), discussing a "continuing lack of remediation efforts in Argentina." Def. SOF ¶ 43; Compl. ¶ 18.

In 2012, Teva was notified by the Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") that they were beginning an investigation with respect to Teva's compliance with the Foreign Corrupt Practices Act ("FCPA"). Def. SOF ¶ 45. In September 2013, Plaintiff was notified by Teva's Legal Department that the government was interviewing many Teva employees and Teva would like Plaintiff to participate. *Id.* ¶ 46. Plaintiff was interviewed by the government on December 4, 2013 and January 23, 2014, and alleges she provided follow-up documents in March and April 2014. ¶ 47.

In March or April of 2014, Plaintiff presented to a group of Teva department heads to provide an updated report about the Shared Service Center, which was intended to give an overview of the region. The final slide of the presentation suggested some areas of improvement related to the SOX process. Def. SOF ¶¶ 52-53; Pl. SOF ¶¶ 52-53 ("Not disputed."). Plaintiff has also recently alleged that in a May 30, 2014 exception report sent to Senior Director LATAM Compliance, Eduardo Buso, Plaintiff identified invoices and expense reports that evidenced potential FCPA violations. Pl. SOF ¶ 74; Hall Decl., ECF No. [74-6] ¶ 17. She further states that around that same time, she had a meeting with Mr. Buso, in which she explained Teva would no longer pay improperly documented invoices because of concerns related to bribery and

corruption. In May or June 2014,[1] she again met with Mr. Buso and raised concerns about commission payments from Teva Mexico to the Algerian government. *Id.*; Hall Dep., ECF No. [68-1] at 282-83, 289. Plaintiff alleges that she was ultimately terminated in retaliation for her participation in this alleged protected activity.

In her response brief, Plaintiff has conceded that summary judgment is proper as to her FMLA retaliation claim (Count II). *See* Resp., ECF No. [81] at 2. Plaintiff opposes summary judgment as to her remaining claims under the Dodd-Frank Act (Count I) and the Florida Whistle Blower Act (Count III).

## II. LEGAL STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "would affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor."). However, material facts set forth in the movant's

---

[1] Plaintiff's declaration states that the second meeting with Mr. Buso occurred in June 2014, but her deposition testimony states that this conversation occurred "[a]bout May of 2014." Hall Dep. at 325.

statement of facts and supported by record evidence are deemed admitted if not controverted by the opposing party. S.D. Fla. L. R. 56.1(b).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence in the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## III. DISCUSSION

No Florida District Court has yet to articulate the elements required to establish a *prima facie* case of retaliation under Dodd-Frank specifically. Following the case law cited in the Federal Rules implementing Dodd-Frank, the Court adopts the "well-established legal framework" for deciding retaliation cases in a variety of other contexts.[2] *See SEC Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300, 34304 n. 41 (June 13, 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see, e.g*., *Kendall v. Shinseki*, 2014 WL 6469433, at *4 (M.D. Fla. Nov. 16, 2014) (quoting *Simpson v. State of Ala. Dept. of Human Res.,* 501 Fed App'x 951, 954 (11th Cir. 2012)) (holding that under Rehabilitation Act, plaintiff must show "(1) he was engaged in statutorily protected expression, (2) he suffered a materially adverse action, and (3) there was some causal relationship between the two events"). Courts similarly apply Title VII retaliation law when analyzing a claim under the FWA. *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000) ("In the absence of any guiding case law, the district court correctly applied the analysis used in Title VII retaliation cases."); *see also Castillo v. Roche Labs., Inc.*, 467 F. App'x 859, 862 (11th Cir. 2012) ("A plaintiff may establish a *prima facie* showing of retaliation by showing that he engaged in a protected activity and suffered an adverse employment action, and that the protected activity and adverse employment action were causally related.") (citing *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir. 2002)).

Accordingly, a valid claim for retaliation under Dodd-Frank and the FWA must allege that (1) plaintiff engaged in a protected activity, (2) plaintiff suffered a materially adverse employment action, and (3) the adverse action was causally connected to the protected activity. *See* 76 Fed. Reg. at 34304 n. 41 (citing *Roadway Express, Inc. v. U.S. DOL*, 495 F. 3d 477, 481-

---

[2] Although immaterial here, the Court notes that "the elements of the prima facie case vary across statutes." *Keene v. Prine*, 477 Fed. App'x 575, 580 (11th Cir. 2012) (citations omitted).

82 (7th Cir. 2007); *Scott v. Metropolitan Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007)).  Similarly, under the FWA, "plaintiff may establish a prima facie showing of retaliation by showing that he engaged in a protected activity and suffered an adverse employment action, and that the protected activity and adverse employment action were causally related." *Castillo v. Roche Laboratories, Inc.*, 467 Fed. App'x 859, 962 (11th Cir. 2012) (applying same *McDonnell Douglas* analysis).

"Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Texas Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal quotations and citations omitted).

## A.  Prima Facie Case

### 1.  Protected Activity

Hall asserts that she engaged in protected activity pursuant to 15 U.S.C. § 78u-6(h)(1)(A) by making protected disclosures and providing testimony and information to the SEC and assisting the SEC with its investigation regarding what she "reasonably believed" to be possible securities law violations. *See* Compl. ¶ 41. Specifically, Plaintiff maintains that she engaged in the following protected activity: (1) assisted in drafting the 2011 SOX Memo; (2) assisted in drafting the 2012 SOX Memo; (3) participated in SEC and DOJ interviews regarding their investigation with respect to Teva's compliance with the FCPA; (4) presented an overview of the SSC Internal Control Group to a group of Teva department heads in Spring of 2014, which included some suggested areas of improvement related to the SOX process; (5) had a

Case No. 15-cv-61536-BLOOM/Valle

conversation with Edward Buso in May or June of 2014 regarding a transaction between Teva Mexico and the Algerian Government that she believed was not documented properly.

The Dodd-Frank Act provides certain protections for whistleblowers against retaliation, stating as follows:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—
>
> **(i)** in providing information to the Commission in accordance with this section;
> **(ii)** in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> **(iii)** in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C.A. § 78u-6(h)(1)(A).

Similarly, under the FWA, "[a]n employer may not take any retaliatory personnel action against an employee because the employee has[,]" *inter alia*,

> [d]isclosed, or threatened to disclose, to any appropriate governmental agency . . . an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation . . . [or] [p]rovided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer . . . .

Fla. Stat. ¶ 448.102.

Defendant argues that internal reports, including the 2011 and 2012 SOX Memos, the Spring 2014 SSC Internal Control presentation, and the Spring 2014 conversations with Mr. Buso, and any other reports or complaints Plaintiff alleges she made to others at Teva, are not protected conduct under Dodd-Frank or the FWA. Specifically, Defendant avers that

11

Dodd-Frank's retaliation provision only extends to reports made to the SEC and therefore Plaintiff's internal complaints are not protected under the Act. *See Duke v. Prestige Cruises Int'l, Inc.*, 2015 WL 4886088, at *3 (S.D. Fla. Aug. 14, 2015). Defendant further argues that these internal reports are not protected activity under the FWA because she has not established that an actual violation of the law occurred, or even her good faith belief that her activity was protected by statute. *See Colon v. Total Renal Care, Inc.*, No. 8:07-CV-151-T26MAP, 2007 WL 4145940, at *3 (M.D. Fla. Nov. 19, 2007) ("[The FWA] requires an actual violation of a law or rule be committed. It is insufficient for the employee to reasonably believe or suspect that a violation has occurred."); *Hernandez v. Publix Super Mkts.*, 11 F. Supp. 3d 1177, 1182 (S.D. Fla. 2014). Moreover, Defendant maintains that these internal reports are not protected under either statute because they do not extend beyond Plaintiff's normal job duties. *See Taylor v. Fannie Mae*, 65 F. Supp. 3d 121, 126 (D.D.C. 2014). Even assuming, however, that these internal reports as well as Plaintiff's participation in the government investigation constitute protected activity under Dodd-Frank and the FWA, Plaintiff has failed to establish a causal connection between these activities and her termination. Plaintiff failed to demonstrate that her termination for violations of the ECP was mere pretext for retaliation.

### 2.  Causal Connection

Defendant does not dispute that Plaintiff has sufficiently demonstrated that she suffered an adverse employment action, but argues that Plaintiff cannot establish a causal connection between her alleged protected activity and her termination. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *Simpson v. Alabama Dept. of Human Resources*, 2012 WL 5873553, at *4 (N.D. Ala. Nov. 16, 2012) (quoting *Gupta v. Fla.*

12

*Bd. of Regents,* 212 F. 3d 571, 590 (11th Cir. 2000)); *see Shannon v. BellSouth Telecomm., Inc.*, 292 F. 3d 712, 716-17 (11th Cir. 2002). This causal element is broadly construed. *See Higdon v. Jackson*, 393 F. 3d 1211, 1220 (11th Cir. 2004).

Defendant argues that there is no record evidence supporting a conclusion that the decision-makers here, Ms. Griffin and Ms. Flaisher, had actual knowledge of Plaintiff's purported protected activity. Ms. Griffin, however, testified that she received updates from legal counsel regarding the government investigation and that Plaintiff was on a list of one of those interviewed, but that she was not aware of how many times and how often Plaintiff spoke with the government. Griffin Dep. at 32-34. Ms. Flaisher also acknowledged that she knew there was an FCPA investigation and that Plaintiff was "involved somehow" because Teva's "internal counsel would have shared with [Ms. Flaisher] that [Plaintiff] was involved." Flaisher Dep. at 35. Further, during the course of the investigation into Plaintiff's alleged ECP violations, Ms. Flaisher stated in an email to Ms. Griffin that there were some "added risks" with Plaintiff's investigation that caused them to want to take additional steps in auditing her laptop. Ex. 21, ECF No. [74-21]. Although Plaintiff has not pointed to any evidence demonstrating that Ms. Griffin and Ms. Flaisher had actual knowledge of the *content* of Plaintiff's interviews with the government, there remains an issue of fact as to whether Ms. Griffin and Ms. Flaisher's general knowledge of Plaintiff's participation in protected activity was causally connected to her termination.

Defendant, however, further argues that the timing of the events in this case is dispositive. Specifically, Defendant contends that "Plaintiff's theory—that Teva, after years of showing no animus whatsoever toward her alleged protected conduct, suddenly flipped a switch in the fall of 2014 and decided to retaliate against her—defies logic and is routinely rejected as a

matter of law." Mot. At 10. Generally, "[a] 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). The Eleventh Circuit has held that "a period as much as one month between the protected expression and the adverse action is not too protracted." *Id.* However, in "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close . . . .'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (holding action taken 20 months later "suggests, by itself, no causality at all") (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)).

Defendant avers that Plaintiff has admitted that she continued to work for Teva, without a single adverse action and indeed received raises and a promotion, for three years after the 2011 SOX Memo was drafted, two years after the 2012 SOX Memo was drafted, about ten months following her second and final interview with the government, seven or eight months after the Spring 2014 presentation, and six months after the conversation with Mr. Buso.

Plaintiff recognizes that there was a significant gap in time between the purported protected activity and the adverse action, but urges that, in such a scenario, she may offer additional evidence to demonstrate a causal connection, "such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." Resp. at 8-9 (quoting *Ward v. United Parcel Serv.*, 580 F. App'x 735, 739 (11th Cir. 2014) ("Where there was a significant time gap between the protected activity and the adverse action, the plaintiff must offer

additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity to retaliate.").

Plaintiff asserts that such a pattern of antagonism is evidenced in Ms. Griffin's displeasure with the 2011 SOX Memo; the fact that after Ms. Griffin took over as Chief Accounting Officer, she took SOX responsibility away from Mr. Torralbas and Plaintiff, to whom he had delegated the job; and Ms. Griffin's opinion that Mr. Torralbas was "being difficult" and that "this kind of thing has got to stop" after Mr. Torralbas refused to sign a SOX certification for 2013.[3] Plaintiff recognizes that these incidents were largely directed at Mr. Torralbas, but argues that a reasonable jury could infer antagonism toward Plaintiff from comments about Mr. Torralbas. Plaintiff also states that Ms. Griffin showed antagonism to Plaintiff directly, stating in an email to Ms. Flaisher that, with regard to Plaintiff's group, Ms. Griffin had "some significant concerns about this entire group and what they are doing." Ms. Griffin testified that she was concerned that the level of work the group was performing did not seem sufficient to justify the resources for a full-time job. *Id.* at 52. Plaintiff also cites to the email exchange between Ms. Griffin and Ms. Flaisher in which Ms. Griffin stated "OMG" when told Plaintiff had applied to work for her in a newly created job while Plaintiff was under investigation by the OBI. *See* Ex. 22; Griffin Dep. at 53. Plaintiff further argues that December 2014 was the first opportunity for Defendant to retaliate because Mr. Torralbas and Plaintiff were brought under Ms. Griffin's supervision in mid-summer 2014 and previously in 2013 and 2014 reported to a more sympathetic supervisor, Kobi Altman. Plaintiff avers that a jury could infer that while Mr. Torralbas and Plaintiff reported to Mr. Altman, they were "protected," but

---

[3] Ms. Griffin testified that she and Mr. Torralbas largely disagreed on the process of compliance and that she wanted to put someone in place who she felt was more objective. Griffin Dep. at 10-11, 57, 67. To the extent she was displeased with the 2011 SOX Memo, Ms. Griffin further testified that she felt Mr. Torralbas could have approached the issue in a more professional manner and could have first had a conversation with Mr. Dearborn, rather than submitting a formal memorandum. *Id.* at 12.

after they "were moved into Griffin's chain of command, she had—and exercised—her first opportunity to rid Teva of Hall and Torralbas." Resp. at 11. Plaintiff also suggests that this was the first opportunity to retaliate because Plaintiff was out on maternity leave from July to November 2014.

To the extent that a pattern of antagonism can be established based upon purported incidents directed at another individual and the two proffered emails between Ms. Flaisher and Ms. Griffin, or that Plaintiff is able to demonstrate that December 2014 was Defendant's first opportunity for retaliation, this issue of fact is undermined by several intervening favorable employment decisions, including "positive reviews, promotions, and raises throughout her employment." Def. SOF ¶ 58; Pl. SOF ¶ 58 ("Not disputed."); *see Ward*, 580 F. App'x at 739 ("Although Ward claimed UPS's employment decision in 2009 was its 'first opportunity' to retaliate, the record does not support this assertion given that UPS made at least two other intervening decisions to re-employ Ward.").

Further, the Eleventh Circuit has held that "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011); *see also Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520–21 (11th Cir. 2007) ("This intervening act of misconduct, which was plainly in violation of Rules 1 and 14 of AirTran Airways Crew Member Handbook, severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran's decision to terminate her employment. . . . Despite a close proximity in time between these events, the evidence establishes that Hankins' flagrant act of misconduct broke the causal chain."); *DeLeon v. ST Mobile Aerospace Eng'g, Inc.*, 684 F. Supp. 2d 1301, 1325–26 (S.D. Ala. 2010) ("The Eleventh Circuit has made clear that even if a plaintiff is terminated in close

temporal proximity to a complaint of discrimination, a plaintiff's intervening act of misconduct severs the causal connection between the employee's initial complaint of discrimination and the decision to terminate her employment. . . . Specifically, Plaintiffs' intervening act of misconduct—failing to report for work when scheduled—severed the causal connection between their initial complaint of harassment and MAE's decision to terminate their employment.").

As discussed *infra*, Plaintiff does not dispute that she committed the conduct underlying Teva's determination that she violated the ECP. These include that Plaintiff sent or received hundreds of emails on her Teva email account related to her personal affairs, caused Teva to be listed as a party to a vendor contract, used Teva's printers, scanners, and computer processing capabilities for her outside activities and used Teva employees to assist her in doing such, and sent confidential Teva documents to her mother. *See* Pl. SOF ¶ 20. Nor does Plaintiff dispute that Teva ultimately concluded that Plaintiff had violated the ECP. *See id.* ¶ 5. Plaintiff's last alleged protected activity, her conversation with Mr. Buso, occurred in either May or June of 2014 and the anonymous OBI hotline tip was received thereafter on June 30, 2014. This anonymous tip, and the subsequent OBI investigation uncovering Plaintiff's purported misconduct serves to sever any causal connection that may have been established by Plaintiff through a pattern of antagonism.

## B. Legitimate, Non-Retaliatory Reason

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. The defendant, however, "need not persuade the court that it was actually motivated by the proffered reasons. . . . The explanation must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima

facie case is rebutted." *Texas Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Plaintiff has failed to establish the causation prong of her retaliation claim. However, even if the Court were to find that she has established a *prima facie* case of retaliation, Defendant's proffered reason—Plaintiff's purported violation of the ECP—meets Defendant's burden of stating a legitimate, non-retaliatory reason for Plaintiff's termination.

### C. Pretext

Once a defendant has offered legitimate, non-retaliatory reasons for its conduct, "a court conducts a focused inquiry. The court must, considering all the evidence, ascertain whether the plaintiff has cast doubt on the defendant's proffered [non-retaliatory] reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct." *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (internal quotations and citation omitted). In order to show pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citing *Burdine*, 450 at 256).

The court "must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Silvera* 244 F.3d at 1258. (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) (citation omitted)). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's

articulated reasons for its decision are not believable." *Jackson* 405 F.3d at 1289 (citing *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994)).

Plaintiff first argues that she may demonstrate pretext by showing that the explanation is simply not true. Indeed, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000). Plaintiff asserts that the ECP does not prohibit personal use of company email and only requires using company email "primarily for business purposes," and that "[p]ersonal use must remain limited, incidental and in no way affect productivity." Resp. at 13; ECP, Ex. 25, ECF No. [74-25] at 2. According to Plaintiff, Ms. Griffin admitted that Plaintiff's personal email use never exceeded her business use; Ms. Flaisher conceded that Plaintiff used electronic resources "mostly for business use"; Plaintiff's average total personal email use was only 9.35 percent of her average use; and there was no investigation into whether Plaintiff's computer usage was affecting her productivity, which had been ranked in years 2010 through 2013 as "exceeding" expectations. Taking these points together, Plaintiff maintains that she did not violate the ECP and therefore a jury may believe that this defense is mere pretext.

In support of this proposition, Plaintiff cites to *Munoz v. Oceanside Resorts, Inc.*, in which the Eleventh Circuit affirmed the district court's denial of an employer's motion for judgment as a matter of law in an age discrimination action. 223 F.3d 1340, 1345 (11th Cir. 2000). In *Munoz*, an employer maintained that the plaintiff had received a written reprimand with clear instructions to not discuss the reprimand with anyone. The employer claimed, but plaintiff denied, that plaintiff then confronted a fellow employee whose signature appeared on the

reprimand and the confrontation was subsequently reported to the supervisor, who ordered plaintiff's discharge for insubordination. *Id.* at 1343-44. The plaintiff testified that he never confronted the employee in defiance of his supervisor's instructions, directly contradicting the testimony of that employee, and "creating a factual conflict properly resolved by the jury." *Id.* at 1345. The Court held that a jury could reject the fellow employee's testimony concerning the confrontation and reporting of the incident, and could accordingly "accept [the plaintiff's] theory of events: that [the supervisor] concocted a scheme that included both a bogus reprimand and a subsequent false accusation of insubordination to cover his discriminatory desire to discharge an older employee." *Id.*

In contrast to *Munoz*, however, Plaintiff has admitted to the underlying conduct which was uncovered following a formal investigation—including sharing confidential Teva documents with her mother, who is not a Teva employee, and causing Teva's name to be added as a party to a vendor's contract—but instead disagrees that her conduct amounted to a violation of Teva's policy. *See* Pl. SOF ¶ 20 ("Not disputed."). Federal courts "are not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015), *cert. denied sub nom. Flowers v. Troup Cty., Georgia, Sch. Dist.*, 136 S. Ct. 2510 (2016) (quoting *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010)). Indeed, this Court is not in the position to second-guess Teva's interpretation of its own policy and whether the undisputed conduct, following a thorough investigation, amounts to a violation of such.

Plaintiff next cites to a number of purported weaknesses, implausibilities, incoherencies, and contradictions that Plaintiff maintains would lead a reasonable factfinder to find Defendant's

reason unworthy of credence. *See Silvera* 244 F.3d at 1258. Indeed, "[a] plaintiff can also create a triable issue of fact concerning an employer's [retaliatory] intent by presenting 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). The Court, however, agrees with Defendant that Plaintiff has merely thrown a "hodgepodge of arguments at the wall" and none have merit.

Plaintiff first asserts that Defendant provided "shifting reasons" for Plaintiff's termination—namely, that Ms. Flaisher claimed that Plaintiff's lack of candor "tipped the scales" in the decision to terminate Plaintiff—yet Mr. Rahill, the OBI investigator, stated that credibility assessments and statements not based on hard facts were deliberately left out of investigative reports. Moreover, Ms. Flaisher never met with Plaintiff during the investigation, Mr. Rahill testified that Plaintiff never lied, and Plaintiff admitted that her personal emails could be ten to fifteen percent of the monthly totals, a percentage that is actually higher than was showed in the report.

However, Mr. Rahill testified that he indeed perceived Plaintiff as being less than candid in her interview, stating that he felt Plaintiff, while not flatly denying it, was "minimizing the extent of her personal business ventures using Teva's equipment". He further stated that Plaintiff referred to her outside business activities as a hobby, although it became clear to Mr. Rahill that Plaintiff's activities "were directly related to a for-profit business, not a hobby." Rahill Dep., ECF No. [68-5] at 14-15, 16 ("A. . . . Ms. Hall repeatedly asserted that her personal use, to the extent that it might have existed, was only in very, very small numbers and infrequent. And as I stated, we did collect information earlier that factually disputed that account."). Again, this Court

21

does not sit as a "super-personnel department" to second-guess the wisdom of an employer's business decisions. *Alvarez*, 610 F.3d at 1266. To the extent that Plaintiff seeks to question Teva's decision-making process, she has failed to demonstrate that there remains a disputed fact as to the primary investigator's subjective belief that Plaintiff lacked candor in her interview and that this was a factor considered by Teva in ultimately determining termination was appropriate.

Plaintiff further argues that the two comparator employees proffered by Defendant involved "behaviors that were palpably more serious" than that of Plaintiff—specifically, the terminations included the presence of offensive material on a computer, several days of documented on-the-clock time that was used for personal business, and the threatening of another employee. *See* Def. SOF ¶ 36; Ex. I, ECF No. [63-2]. Plaintiff's argument is inapposite. A plaintiff may support her burden of showing pretext by providing other similarly situated employees who were not in plaintiff's protected group and who in engaged in similar conduct but were treated more favorably. *See Silvera* 244 F.3d at 1259 ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.") (internal citation omitted). There is no corresponding burden, however, placed upon a defendant to establish comparators that were treated similarly. To the extent that Defendant has cited to these employees to bolster its argument that it has presented a legitimate, non-discriminatory reason for termination—namely, Plaintiff's purported violation of the ECP—it appears that those two employees were indeed also terminated for conducting personal business matters during Teva's business hours. *See* Ex. I. The Court does not find that Defendant's reference to these employees amounts to an "implausibility" such that a reasonable

jury could infer pretext merely because these employees' violations of company policy may be arguably worse.

Plaintiff also asserts that certain "incoherencies" exist among Defendant's actions because Defendant claims that it waited to interview Plaintiff about the OBI investigation until November 2014 so as to not interfere with Plaintiff's maternity leave. *See* Def. SOF ¶ 27. Plaintiff argues that the record demonstrates that Plaintiff "worked regularly throughout her leave, including meeting with PwC auditors and participating in a meeting with [the] Head of Global Finance," which permitted her to extend her maternity leave by a couple of weeks. Resp. at 15 (citing Pl. SOF ¶ 106; Ex. 26, ECF No. [74-26]. Plaintiff argues that she, therefore, "easily could have been available for an interview with OBI" and Defendant delayed Plaintiff's interview not out of concern for Plaintiff and her new baby, but because it was "busy preparing a 'justification'" for the DOJ. Resp. at 15-16. Plaintiff's assertion is far too speculative and does not sufficiently demonstrate an incoherency in Defendant's actions. The mere fact that Plaintiff may have chosen to participate in a number of meetings while on leave does not imply permission for Defendant to interview Plaintiff while she was on leave. Indeed, a ripe FMLA lawsuit may have resulted if Defendant had hailed Plaintiff in from protected activity—maternity leave—for an investigation that ultimately resulted in her termination. Plaintiff similarly argues that the same information was available to Defendant in July 2014 as in December 2014, and it is implausible for Defendant to have waited until five months after the last incident of protected activity to take action on the findings of the OBI investigation. This delay, according to Plaintiff, gives rise to an inference that Defendant was acting to strategically sever any temporal proximity between the protected activity and termination in anticipation of litigation. However, in light of Plaintiff's maternity leave until November 2014, Plaintiff's argument is far too speculative to

raise a genuine issue of fact that it is "implausible" that Defendant waited until November 2014 to interview Plaintiff regarding the investigation.

Plaintiff also points to what she labels as contradictions and implausibilities of Defendant's internal process related to Plaintiff's termination. First—in a vague heading entitled "Why didn't they just tell us the truth?"—Plaintiff states that Defendant maintains that only two people, Ms. Flaisher and Ms. Griffin, participated in the decision to terminate Plaintiff. Ms. Flaisher, however, conferred with others such as Mr. Dearborn, Ms. Veit, and Mr. Pease, including on a November 14, 2014 conference call, before recommending termination. Ms. Flaisher testified that before the final determination was made, she consulted with internal legal counsel, including Mr. Pease and Tom McDonough, on "how to handle the results of the investigation" and "to make sure that we were conducting the investigation right from a legal standpoint, interpreting the policy right from a legal standpoint, and taking the right course of action." Flaisher Dep., ECF No. [84-1] at 3. The Court agrees with Defendant that "seeking legal advice does not convert an in-house attorney into a [decision-maker]." Reply at 5 (citing *Waugh v. Pathmark Stores, Inc.*, 191 F.R.D. 427, 431 (D.N.J. 2000) for the proposition that an in-house attorney's participation in a meeting to discuss an internal investigation of plaintiff's discrimination complaints and rendering advice on remediation did not convert attorney into a decision-maker). Ms. Flaisher further testified that she "made the recommendation with input from [Ms. Veit] and [Mr. Dearborn], of course, and [Mr. McDonough]." Flaisher Dep., ECF No. [74-1] at 44. To the extent Ms. Flaisher consulted with others, including internal counsel, before making her final recommendation, it is unclear who Plaintiff is implying did not tell the truth and how this amounts to a genuine contradiction or demonstrates pretext.

24

Plaintiff further cites to Ms. Flaisher's statement that there was no need to justify Teva's actions to the DOJ and that Teva need only notify them, but a November 20, 2014 email stated that the execution of the termination would be delayed to allow Teva time to finish preparing its justification of Plaintiff's termination. *See id.* at 45[4]; *id.* at 47[5]; Ex. 23, ECF No. [74-23] ("We had to delay the conversation with [Plaintiff] until tomorrow afternoon. Compliance needed a few more days to prepare the background. The course of action remains the same, it is just about preparing our justification for the DOJ that caused the delay."). Plaintiff, through her one word argument—"[w]hoops"—presents this as her coup de grâce "gotcha" moment. This apparent argument, however, relies upon a cherry-picked and quite literal interpretation of Ms. Flaisher's testimony. Indeed, Ms. Flaisher acknowledged that due to Plaintiff's participation in the government investigation, Teva's decision would be subject to more scrutiny. Ms. Flaisher also recognized her unfamiliarity with the process, testifying that although she was aware that the government would need to be alerted about the decision, she did not know how they were alerted or what would need to be provided to them. Ms. Griffin similarly testified that Ms. Flaisher was likely referring to the fact that Teva needed to get documentation to the DOJ, and that someone was preparing that documentation, thereby delaying the process. *See* Griffin Dep. at 56-57.[6]

---

[4] "Q. My question is: So you were not aware that compliance needed a few more days to prepare the background so that you could justify your action for the DOJ? A. I was aware that there was—because [Plaintiff] was involved in the FCPA investigation, that there was a need to alert the government of our decision. But how they were alerted, if they were given any documents, who alerted them, I don't know; but I was aware that that was a step that needed to be taken. Q. But you're not aware of any need to justify your action. You were just aware of the need to notify of your action. Is that your testimony? A. That was my understanding. It was about notifying, yes."

[5] "Q. And because you knew it would create more risk, you took particular care to document all of the reasons why she was being terminated; correct? A. We always—yeah, we took a lot of care to document this report and the allegations around [Plaintiff]."

[6] "Q. . . Why were you preparing a justification for the DOJ about Keisha Hall's termination A. Well, I personally wasn't preparing anything. My understanding of Teva's obligation was we had to get the approval of the DOJ whenever anybody that was on the interview list was going to have a change in employment, and we had an obligation to inform them of the facts behind the decision making and what was going on. So that was my understanding of this email, that somebody was preparing the document to

Plaintiff does not cite to any other evidence beyond her narrow reading of Ms. Flaisher's testimony, which fails to establish a genuine issue of fact as to any purported inconsistencies in Teva's need to justify Plaintiff's termination to the DOJ.

Plaintiff next cites to the fact that Teva's "fancy" final investigative report was not finalized until December 2014 after Plaintiff was terminated. Moreover, Ms. Flaisher's recommendation of termination depended on the July 2014 draft report instead of the heavily-documented final report. Plaintiff argues that this could create an inference that the final report was created only to cover a retaliatory termination to avoid issues with the DOJ and protect against a potential lawsuit. The record reveals, however, that this was standard practice for Teva and that the final report typically serves as a "record copy" of the investigation. *See* Rahill Dep., ECF No. [84-3] at 3-4 ("Q. Is the—and again, I'm talking about standard operating procedure—is the final report completed before a final decision on discipline is made? A. I don't know. I would say that's probably not true. I would say final reports are generally written after the fact. Q. Why is that? A. Because the report is sort of the record copy of the entire investigation. It's not—you know, in some cases, like I said, to the extent that they need something in writing to make a decision on discipline, that would be an interim report or a series of interim communications. Whereas the final report would be documenting the entire investigation for the record."). Plaintiff has not cited, nor has the Court identified, any record evidence that demonstrates that the creation of a post-termination final investigative report is anything but "standard operating procedure" for Teva. Based on the record before it, the Court does not find that a reasonable jury could infer retaliation based upon Ms. Flaisher's reliance upon an interim report in recommending Plaintiff's termination.

---

share with the DOJ, and that was delaying the issue. . . . [W]hat [Ms. Flaisher] is referencing is that they needed to have that documentation provided to the DOJ. That's what I take away from that email."

Case No. 15-cv-61536-BLOOM/Valle

Plaintiff does not dispute that she participated in misconduct that her employer concluded was an egregious violation of company policy. Even viewing the facts in the light most favorable to Plaintiff, she has simply not presented sufficient record evidence to demonstrate that a reasonable jury would conclude that this reason is unworthy of credence. Accordingly, the Court grants summary judgment in favor of Defendant.

## IV. CONCLUSION

For the reasons stated above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment, **ECF No. [66]**, is **GRANTED**.

2. Summary judgment is entered in favor of Defendant Teva Pharmaceuticals as to Counts I, II, and III of the Complaint, ECF No. [1].

3. The Clerk is instructed to **CLOSE** this case. All pending motions, including Defendant's Motion to Continue, ECF No. [87], are **DENIED AS MOOT**.

4. All deadlines, including calendar call and trial, are **CANCELLED**.

5. Final judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida, this 30th day of September, 2016.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:    Counsel of Record

27